# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America, ex rel.
Kenneth Kraemer, and Kenneth
Kraemer and Kraemer Farms, LLC,
a Minnesota limited liability company,

        Plaintiffs,

v.

United Dairies L.L.P., a Minnesota limited
liability partnership; Union Dairy, L.L.P.,
a Minnesota limited liability partnership;
Westland Dairy, LLP, a Minnesota limited
liability partnership; Alpha Foods, L.L.P.,
a Minnesota limited liability partnership;
Nicholas Ridgeway; Craig Achen; Steven
Landwehr; Thomas Landwehr; Matthew
Landwehr; Robert Hennen; Silverstreak
Dairies, LLC, a Minnesota limited liability
company; Greg Marthaler; Marthaler
Properties Family LLLP, a Minnesota limited
liability limited partnership, d/b/a Marthaler
Farms; and Dairyridge, Inc., a South Dakota
corporation,

        Defendants.

Civil No. 16-3092 (DWF/LIB)

**AMENDED**
**MEMORANDUM**
**OPINION AND ORDER**

---

Chad A. Blumenfield and Pamela A. Marentette, Assistant United States Attorneys,
United States Attorney's Office, counsel for Plaintiff United States of America, ex rel.
Kenneth Kraemer.

Matthew Albin Anderson, Esq., Law Office of Matthew A. Anderson; Thomas F.
DeVincke, Esq., and Patrick B. Steinhoff, Esq., Malkerson Gunn Martin LLP, counsel for
Plaintiffs Kenneth Kraemer and Kraemer Farms, LLC.

Gary R. Leistico, Esq., and Alexander T. Mastellar, Esq., Rinke Noonan, counsel for
Defendants.

## INTRODUCTION

Plaintiff-relators Kenneth Kraemer ("Kraemer") and Kraemer Farms, LLC (collectively, "Plaintiffs") initiated this *qui tam* action on behalf of the United States of America (the "Government"), against Defendants United Dairies L.L.P. ("United"), a Minnesota limited Liability partnership; Union Dairy, L.L.P. ("Union"), a Minnesota limited liability partnership; Westland Dairy, LLP ("Westland"), a Minnesota limited liability partnership; Alpha Foods, L.L.P. ("Alpha"), a Minnesota limited liability partnership; Nicholas Ridgeway ("Ridgeway"); Craig Achen ("Achen"); Steven Landwehr ("S. Landwehr"); Thomas Landwehr ("T. Landwehr"); Mathew Landwehr ("M. Landwehr");[1] Robert Hennen ("Hennen"); Silverstreak Dairies, LLC ("Silverstreak"), a Minnesota limited liability company; Greg Marthaler ("Marthaler"); Marthaler Properties Family LLLP ("Marthaler Farms"), a Minnesota limited liability limited partnership, d/b/a Marthaler Farms; and Dairyridge, Inc.("Dairyridge"), a South Dakota corporation (collectively "Defendants").  (Compl.)

Plaintiffs' *qui tam* Complaint was filed under seal on September 15, 2016.  (*Id.*) The Complaint was unsealed on August 4, 2017 and served on Defendants between August 24 and September 5, 2017.  (*See* Doc. Nos. 18, 25, and 26.)

---

[1]      Plaintiffs' Complaint refers to this Defendant as "Matthew Landwehr."  (Doc. No. 1 ("Compl.") ¶ 6.)  According to Defendants, the proper spelling of this Defendant's name is "Mathew Landwehr."  (Doc. No. 23 ("Answer") ¶ 6.)  The Court will use Defendants' spelling.

Kraemer asserts two causes of action under the False Claims Act ("FCA"), 31 U.S.C.

§ 3729(a)(1), and a third cause of action for Unjust Enrichment, on behalf of the

Government.[2]  (Compl. ¶¶ 72-81.)  Kraemer and Kraemer Farms, L.L.C. initially alleged

four additional causes of action (the "Kraemer Counts"):  (1) retaliation under the FCA,

31 U.S.C. § 3730(h) against Defendants United, Union, Ridgeway, Achen, S. Landwehr,

T. Landwehr, M. Landwehr, and Hennen (*id.* ¶¶ 82-87); (2) breach of contract against

United, and the same individuals listed in Kraemer Count One (*id.* ¶¶ 88-96);

(3) declaratory judgment against the same defendants for the breach of contract alleged in

Kraemer Count Two, (*id.* ¶¶ 97-103); and (4) breach of contract against Union (*id.*

¶¶ 104-08).

Only the first Kraemer Count remains.  The Court dismissed Count IV with

prejudice on March 26, 2018.  (Doc. No. 66.)  The Court found Counts II and III subject

to mandatory arbitration and dismissed them without prejudice on July 6, 2018.  (Doc.

No. 69 ("Order").)  Counts II and III were subsequently resolved through arbitration on

August 30, 2018.  (Doc. No. 95 ("Leistico Decl.") ¶ 5, Ex. 1.)

---

[2]      The first and second causes of action are alleged against Defendants United, Union, Westland, Alpha, Hennen, Silverstreak, Marthaler, Marthaler Farms, and Dairyridge for "[s]ubmission, or [c]ausing the [s]ubmission, of False Claims" (Compl. ¶¶ 72-75); and "[u]sing a [f]alse [r]ecord or [s]tatement to [o]btain [p]ayment of a False Claim" (Compl. ¶¶ 76-79 ), respectively.  The third cause of action is alleged against all Defendants.  (Compl. ¶¶ 80-81.)

This matter is before the Court on Plaintiffs' motion for partial summary judgment (Doc. No. 86), and Defendants' motion for summary judgment (Doc. No. 92).[3]  For the reasons set forth below, the Court denies Plaintiffs' motion, and grants in part and denies in part Defendants' motion.  Specifically, the Court dismisses Defendant Silverstreak as a party, but denies Defendants' motion in all other respects.

## BACKGROUND

Kraemer was a partner in Defendants Union and United, Minnesota partnerships involved in dairy farming operations.  (Doc. No. 37 ("R. Hennen Decl.") ¶ 3, Ex. 1 at 1, §§ 1.3, 2.1; R. Hennen Decl. ¶ 4, Ex. 2 at 1, §§ 1.3, 2.1.)  The partnerships also grow corn or contract with other growers to produce corn crops.  (*See* Compl. ¶¶ 32, 57.)  The partnerships and other defendants obtain insurance from the federal government to protect against crop losses.  (*See id.* ¶¶ 1-3.)

The United States Department of Agriculture ("USDA") administers crop insurance policies through its Federal Crop Insurance Corporation ("FCIC") and its Risk Management Agency ("RMA").[4]  (*See* Compl. ¶¶ 2-3.)  The RMA serves as a reinsurer to

---

[3]     Plaintiffs move for partial summary judgment against six of the fourteen Defendants:  United, Union, Westland, T. Landwehr, Marthaler, and Marthaler Farms.  (Doc. No. 86.)  Kraemer moves on behalf of the Government only with respect to liability on the statutory claims stated in his first two causes of action under the FCA.  (*See id.*; *see also* Compl. ¶¶ 72-79.)

[4]     7 U.S.C §§ 1501-1524 establishes the FCIC's legal framework.  The FCIC's general powers include authorization to issue regulations necessary to conduct its business and to carry out the purpose of federal statutes.  *See, e.g.*, 7 U.S.C. § 1506 (l), (o).

(Footnote Continued on Next Page)

4

private insurance companies.[5]  (Doc. No. 89 ("Steinhoff Decl.") ¶ 7, Ex. C ("Voy Dep.")

at 12; Compl. ¶ 2)  The RMA writes the terms, establishes the rates and coverages, and

develops the policies and procedures that govern the crop insurance policies; however,

the policies are sold and administered by authorized private insurance companies.[6]  (Voy

Dep. at 12-14; Compl. ¶¶ 2-3.)  The RMA makes administrative and operating payments

to the private insurance companies for the cost of administering the policies.  (Voy Dep.

at 14.)  The RMA also pays premium subsidies to the private insurance companies on

behalf of the policy holder.  (*Id.*)  Losses are a shared risk between the RMA and the

private companies.  (*Id.* at 14, 27.)

Insurance coverage is available for both grain corn and silage corn; however, the

policies are different.  (*Id.* at 22; *see also* Voy Dep., Ex. 1 ("Policy") at ¶5(b)(1) ("[T]he

crop insured will be all corn that is [] [p]lanted for harvest either as grain or as silage.").)

---

(Footnote Continued From Previous Page)
The Code of Federal Regulations applies the FCIC's statutory mandate and includes
provisions that form part of the insurance policy contract offered to growers.  *See*
7 C.F.R. §§ 400-457.  7 C.F.R § 457.113 establishes the "[co]arse grains crop insurance
provisions" reflected in the insurance policies relevant to the above-entitled matter.  *See*
7 C.F.R. 457.113.

[5]     The RMA has a contract with the private insurance companies that sell and
administer its policies.  (Voy Dep. at 71.)  The private insurance companies in turn have a
contract with the growers who purchase the insurance policies.  (*Id.*)  The RMA instructs
growers to direct any questions they have about the policies to agents who work for the
private insurance companies.  (*Id.*)

[6]     When there is a loss, private insurances companies are bound by the RMA's loss
adjustment manual and loss adjustment standards handbook for that specific crop.  (Voy
Dep. at 26.)

Silage is corn that is often fed to livestock.  (*See id.* at 23; *see also* Policy at 1 (defining silage as "[a] product that results from severing the plant from the land and chopping it for the purpose of livestock feed").)  Grain is corn that is typically processed with a combine and sold on the market to other end-users.[7]  (*See* Voy Dep. at 24, 37.)

The coverage, premium, and actuarial tables for grain and silage insurance are different because there are different risks associated with each type.  (*Id.* at 24, 36-37.) For example, revenue protection is a coverage that is only available for grain corn.  (*Id.* at 38.)  Revenue protection insures both the yield and the price of a crop so that a specific revenue is guaranteed even if the market price drops.  (*Id.*)  Revenue protection is not available for silage corn because it generally is not sold.  (*Id.* at 37.)  Insurance coverage for silage is based only on yield, determined by a grower's average production history. (*Id.* at 38.)

To be eligible to participate in crop insurance, a grower must submit an application, annual acreage report, and production history report.  (Compl. ¶ 4.)  The annual acreage report includes the:  (1) amount of acreage of the crop in the county (insurable and not insurable) in which the grower has a share and the date the insured crop was planted; (2) grower's share at the time coverage beings; (3) practice;  (4) type; and (5) the land identifier for the crop acreage.  *See* 7 C.F.R. § 457.8, Model Policy § 6(c)(1)-(5)).  The Acreage Reporting Form includes a statement above the signature block whereby the grower certifies the truthfulness of the reporting and acknowledges

---

[7]    Corn planted as grain has quality specific coverages that are not applicable to silage because silage typically is not sold on the market.  (*See* Voy Dep. at 24, 37.)

that "failure to report completely and accurately" may result in criminal or civil penalties under the FCA.  (*See* Steinhoff Decl. ¶¶ 18-20,  Exs. N-P ("Acreage Reporting Forms").)

Each year, a grower also completes a USDA document called "Form 578." (Steinhoff Decl. ¶ 11, Ex. G ("Triplett Dep.") at 23; Voy Dep. at 45.)  After planting crops, the grower completes Form 578 and files it at a Farm Services Agency ("FSA") office.  Form 578 requires a grower to identify the type of crop planted in each field. (*See* Steinhoff Decl. ¶¶ 15-17, Exs. K-M ("Form 578s").)  For corn crops, Form 578 includes a column to indicate intended use[8] as either "GR" (for grain), or "FG" (for forage).[9]  (*Id.*)  Form 578 also includes a statement above the signature block which requires the grower certify that the information in the form is true.  (*Id.*)

While the FSA developed Form 578 primarily for use in other farm programs, insurance companies and the RMA use it to cross-check and verify information reported on the Acreage Reporting Form.  (Triplett Dep. at 22-24).  Accordingly, growers are required to provide insurance agents with copies of Form 578 on the date of or prior to filling out the Acreage Reporting Form.  (*Id.*)

The type of insurance coverage available for corn depends on the county where the corn is grown.  (Voy Dep. at 18.)  The RMA designates counties as:  (1) grain only; (2) silage only; (3) or both grain and silage.[10]  (*Id.*).  If a grower lives in a county

---

[8]     Intended use is indicated on the form as "Int. Use."  (Form 578s.)

[9]     Silage is a type of forage.  (*See* Triplett Dep. at 25.)

[10]     In some counties, the RMA does not offer insurance for any type of corn.  (*Id.* at 50.)

designated as silage only but wishes to grow corn as grain and obtain the requisite

coverage, the grower may request written permission from the RMA to grant an

exception.  (*Id.* at 19.)  In counties where both grain and silage are insurable, a grower

must report the acreage of each type on the Acreage Reporting Form to determine which

coverage applies to which crops.[11]  (*Id.* at 53; Policy at ¶ 5(c)(1); *see also* 7 C.F.R.

§ 457.113 ("[A]ll insurable acreage will be insured as the type or types reported by you

on or before the acreage reporting date.").)  The 2014 FCIC Crop Insurance Handbook

states:[12]

> For corn, grain and silage counties are counties for which the actuarial
> documents provide grain and silage types.  Both types are insurable.
> Insureds must report insurance acreage by unit and by type (grain or silage)
> according to the intended method of harvest.

(Voy Dep., Ex. 3 ("Crop Ins. Handbook") ¶ 5 at 411.)  In the event of damage or loss, the

Policy specifies:

> If you will harvest any acreage in a manner other than as you reported it for
> coverage (*e.g.*, you reported planting it to harvest as grain but will harvest
> the acreage for silage, or you reported planting it to harvest as silage but
> will harvest the acreage for grain), you must notify us before harvest
> begins.

(Policy at ¶ 10(c).)

---

[11]    The counties relevant to the above-entitled matter may be insured for silage or grain.  (*See* Voy Dep. at 49-51, Ex. 6.)

[12]    The same statement appears in prior and subsequent FCIC Crop Insurance Handbooks.

The Crop Ins. Handbook also states, "a variety of corn adapted for use as silage only is not insurable as grain and must be insured as silage." (Crop Ins. Handbook ¶ 5.) The Policy similarly specifies that coverage is not available for "a variety of corn adapted for silage use only when reported for insurance as grain."[13] (Policy ¶ 5(b)(2)(ii).) Neither the Crop Ins. Handbook nor the Policy define which varieties of corn adapted for silage use are not insurable as grain. (*See* Crop Ins. Handbook; *See also* Policy.)

There are several varieties of corn adapted for silage use, including brown mid rib ("BMR"). (Leistico Decl. ¶ 11, Ex. 7 ("Plehn Dep.") at 47.) BMR is a silage-hybrid that has a recessive mutation which increases digestibility when it is processed as silage. (*See* Plehn Report at 4; Leistico Decl. ¶ 19, Ex. 15 ("Miller Report") at 4.) It also produces a standard ear of yellow corn that can be processed and sold as grain. (Miller Report at 4; Plehn Dep. at 116-117.)

In the fall of 2013, United, through one of its partners, claimed revenue losses for BMR seeds planted as grain corn and obtained crop insurance proceeds from the federal government. (Compl. ¶¶ 34, 36.) United made similar claims for losses in 2014 and 2015, obtaining crop insurance proceeds in both years. (*Id.* ¶¶ 41, 43, 48, 50.) In the fall of 2014, Kraemer began to suspect that United may have been falsely certifying the type of crop it planted in obtaining insurance. (*See id.* ¶¶ 52, 53.) Specifically, Kraemer suspected that United was falsely certifying crops as grain corn when they were actually silage corn and receiving insurance payments on that basis. (*See generally id.* ¶¶ 26,

---

[13]     Adapted corn is also referred to as "corn seed hybrids." (*See* Steinhoff Decl. ¶ 14, Ex. J ("Plehn Report") at 4.)

28-50.)  Plaintiffs allege similar crop insurance fraud by other entities and their partners, including Union, Westland, Alpha Foods, Marthaler Farms, Dairyridge, and Silverstreak. (*Id.* ¶¶ 28-71.)

Troubled by the possibility that the partnership might have received insurance proceeds through fraud, Kraemer met with United's managing partner on September 11, 2014 to explain his concerns.  (*See id.* ¶ 52.)  The managing partner told Kraemer that he would look into the matter, but no corrective action was taken.  (*Id.* ¶¶ 52-55.)  Kraemer conducted an investigation into the possible fraud against the government and retained his own counsel to remedy the alleged wrongdoing.  (*Id.* ¶¶ 55-56.)

According to Kraemer, in October 2014, the other United partners began to retaliate against him by providing themselves compensation for management activities without compensating Kraemer, disproportionately paying distributions, and excluding Kraemer from partnership management.  (*Id.* ¶¶ 54, 83-85.)  Kraemer and the other United partners subsequently began communicating with each other exclusively through their respective counsel.  (*See id.* ¶¶ 54-56.)  On July 29, 2016 and August 2, 2016, counsel for Kraemer sent a letter to counsel for United, relaying Kraemer's allegations regarding the crop insurance fraud and the other partners' retaliatory conduct.  (Doc. No. 48 ¶¶ 5, 6, Exs. C & D.)  On September 15, 2016, Plaintiffs filed a *qui tam* complaint under seal against United, United's partners, and other defendants in this court.  (*See* Compl.)  The Complaint was unsealed on August 4, 2017 and served on Defendants between August 24 and September 5, 2017.  (*See* Doc. Nos. 18, 25, and 26.)

Several Defendants seek dismissal from this action for a variety of reasons:
(1)  Defendants Westland, Union, Alpha, Marthaler Farms, Dairyridge, T. Landwehr and
Marthaler because any claim they made was not false, and, in the alternative, no false
claim was made knowingly, and none was submitted as a claim for payment to the
government; (2) Defendants Ridgeway, Achen, Hennen, S. Landwehr, and M. Landwehr
because they were not involved with certifications or procurement of crop insurance;
(3) Defendant United because it is a management entity that does not own crops or crop
insurance; (4)  Defendant Dairyridge because Plaintiffs failed to plead fraud with
particularity; and (5) Defendants Silverstreak and Hennen because they did not certify
BMR or any similar nonconventional varieties as grain corn during the relevant years.
(Doc. No. 94 ("Defs.' Memo.") at 45-46, 55.)

Defendant United and its partners, Ridgeway, Achen, S. Landwehr, T. Landwehr,
M. Landwehr, and Hennen, also seek dismissal of Kraemer Count I, retaliation damages
under the FCA, because it was already litigated and disposed of in arbitration and, in the
alternative, because FCA retaliation damages are only available in an employment-type
relationship.  (*Id.* at 48-49.)

All Defendants seek dismissal of the claim for unjust enrichment because there is
no evidence of wrongdoing and they were entitled to the money received for crop
insurance payments.  (*Id.* at 47.)  Finally, Defendants seek an award for attorney fees and
expenses because they allege that Plaintiffs' claims are vexatious and brought primarily
for purposes of harassment.  (*Id.* at 55; Doc. No. 23 at 19 ¶¶ 1-5.)

11

Plaintiffs move on behalf of the Government only with respect to their first and second causes of action and only against Defendants United, Union, Westland, T. Landwehr, Marthaler, and Marthaler Farms.  Plaintiffs contend that there are no disputed issues of material fact concerning whether these Defendants are liable to the United States under the FCA.  (Doc. No. 88 ("Plaintiffs' Memo.") at 2.)

## DISCUSSION

## I.     The False Claims Act

Under the FCA's *qui tam* provisions, relators—private citizens acting as whistleblowers—may sue on behalf of the Government to recover damages for submission to the Government of materially false claims for payment.  31 U.S.C. §§ 3729, 3730; *see, e.g.*, *U.S. ex rel. Donegan v. Anesthesia Assocs. of Kan. City, PC*, 833 F.3d 874, 876 (8th Cir. 2016).  "The FCA attaches liability, not to the underlying fraudulent activity, but to the claim for payment."  *U. S. ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5*, 688 F.3d 410, 414 (8th Cir. 2012) (quoting *U.S. ex rel. Costner v. URS Consultants, Inc.*, 153 F.3d 667, 677 (8th Cir. 1998)).  As such, a viable FCA claim generally requires a relator to establish that the defendant presented a claim for payment to the Government, that the claim was false or fraudulent, and that the defendant knew the claim was false or fraudulent.  *U.S. ex rel. Simpson v. Bayer Healthcare (In re Baycol Prods. Litig.)*, 732 F.3d 869, 875 (8th Cir. 2013).  In addition, an FCA violation requires proof that a false or fraudulent claim or statement was material to the Government's decision to pay a claim.  *Universal Health Servs., Inc. v. U.S. ex rel.*

*Escobar*, 136 S. Ct. 1989, 2001 (2016); *U.S. ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 797 (8th Cir. 2011).

Before turning to the motions filed by the parties, the Court briefly addresses the FCA's knowledge requirement, which the parties dispute.  Under the FCA, a defendant must *knowingly* present a materially false claim.  *In re Baycol*, 732 F.3d at 875.  The FCA defines "knowing" as having "actual knowledge" or acting "in deliberate ignorance of" or "reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A).  It does not require "proof of specific intent to defraud."  *Id.* § 3729(b)(1)(B).

As in this case, an FCA claim may arise when a defendant certifies compliance with statutory, regulatory, or contractual requirements but allegedly does not comply with such requirements.  *See, e.g.*, *Escobar*, 136 S. Ct. at 1995-96; *Donegan*, 833 F.3d at 876-77; *U.S. ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 827 (8th Cir. 2013).  A defendant does *not* knowingly present a false claim when:  (1) the requirement at issue is "ambiguous"; (2) the defendant acted pursuant to an "objectively reasonable" interpretation of the requirement; and (3) no formal government guidance warned the defendant away from its interpretation of the requirement.  *Donegan*, 833 F.3d at 878-79; *see also U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-91 (D.C. Cir. 2015) (applying the interpretation of "reckless disregard" established in *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69-70 (2007)); *Ketroser*, 729 F.3d at 832 ("[Defendant's] reasonable interpretation of any ambiguity inherent in the regulations belies the scienter necessary to establish a claim of fraud under the FCA.").

13

## II.      Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the

light most favorable to the nonmoving party.  *Weitz Co., LLC v. Lloyd's of London*, 574

F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly

regarded not as a disfavored procedural shortcut, but rather as an integral part of the

Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive

determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)

(quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna*

*Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate

the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v.*

*Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly

supported motion for summary judgment "may not rest upon mere allegation or denials

of his pleading, but must set forth specific facts showing that there is a genuine issue for

trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## III.     Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs allege that Defendants United, Union, Westland, T. Landwehr,

Marthaler, and Marthaler Farms are liable to the Government because they made false

statements to both their crop insurance companies and to the USDA.  Specifically,

Plaintiffs allege that these Defendants falsely certified and reported silage corn as grain corn on their Acreage Reporting Forms and Form 578s; that they did so with knowledge of the falsity of their certifications and reports; and that they did so for the purpose of obtaining crop insurance benefits that they otherwise would not have received.

Plaintiffs argue that both the Policy and the Crop Ins. Handbook require farmers to insure their corn according to their intended method of harvest. They contend that Defendants clearly intended to harvest some, if not most, of their corn crops for silage, but certified and reported their crops as grain.

Defendants argue that that they did not make a false claim because there is no authority for Plaintiffs' argument that insurance is tied to a grower's intended method of harvest. They allege that there is nothing in the Policy, and that the Crop. Ins. Handbook lacks binding authority.[14] Defendants contend that insurance coverage is tied to seed-type and that they specifically chose BMR because of its versatility to be harvested as either silage or grain. In the alternative, Defendants argue that they did not make any false claim knowingly because of ambiguous federal guidance and reliance on their authorized private insurance agents.

The Court finds that there is sufficient authority linking coverage to a grower's intended method of harvest. The Policy clearly states:

> If you will harvest any acreage in a manner other than as you reported it for coverage (*e.g.*, you reported planting it to harvest as grain but will harvest the acreage for silage, or you reported planting it to harvest as silage but

---

[14]    Defendants also argue that the Crop Ins. Handbook is directed at insurance agents as opposed to growers.

will harvest the acreage for grain), you must notify us before harvest
begins.

(Policy at ¶ 10(c).)  Form 578, which growers must submit with their application to

obtain crop insurance, also includes a column titled "Int. Use." (Form 578s.)  It is clear

that corn insurance is tied to a grower's intended method of harvest.  Defendants concede

that as dairy farmers, they intended to harvest at least some of their corn as silage--the

precise amount determined by environmental factors.  (*See, e.g.*, Leistico Decl. ¶ 14,

Ex. 10 ("T. Landwehr Dep.") at 33-34, 55, 116-117; Doc. No. 90 ("Kraemer Decl.") ¶ 15,

Ex. D.)  Therefore, each time Defendants certified *all* of their corn as grain, they made a

false claim.  The relevant inquiry is whether they did so knowingly.  *United States ex rel.*

*Simpson.*, 732 F.3d at 875.

Crop insurance agents rely on Form 578 to verify growers' crops; therefore, the

Court first must determine whether Defendants knowingly certified their Form 578s

falsely.  While Form 578 includes a column labeled "Int. Use," both T. Landwehr and

Marthaler testified that they relied on FSA agents to help complete Form 578.[15]

Specifically, they averred that they used aerial photographs of their land to indicate where

they planted corn.  (Doc. No. 98 ("T. Landwehr Decl.") ¶ 7, Ex. A ("Aerial Map");

(Leistico Decl. ¶ 13, Ex. 9 ("Marthaler Dep.") at 65-67, 71.)  Marthaler explained:

> So you go in there [the FSA office] and they tell you to mark corn or beans
> on the maps.  And then they have you designate irrigated or not irrigated.
> And you fill out the maps and then you give them to them and they record
> it.

---

[15]     T. Landwehr and Marthaler were responsible for certifying the alleged false claims
on behalf of their respective entities.

16

(Marthaler Dep. at 71.)  Marthaler continued:

> You stand at the [FSA] counter and they hand you the maps, typically.  And then you write on the maps and give them to them and they give you a form back to sign.  You're standing at a counter.  They need to get a lot of people through there, so they keep things moving pretty good.

(*Id.* at 127.)  Marthaler testified further that no one at the FSA ever asked him about intended use when he reported corn.  (Marthaler Dep. at 92-93, 97, 156-158.) T. Landwehr similarly declared that until 2017, he was never asked by anyone at FSA to indicate whether he intended to harvest his corn as grain or silage.  (T. Landwehr Decl. ¶ 8.)

Outside of the Policy and the Crop Ins. Handbook, the record does not reflect any official guidance with respect to "intended use," nor does it reflect the custom and practice with respect to reliance on FSA agents to fill in the "Int. Use." column on Form 578.  The record does reflect a chaotic process at the FSA office in which growers exchange maps of their fields for a form that they sign without being asked how they intend to harvest their corn.

The Court has reviewed the acreage maps and the handwritten notations indicating simply "corn."  While there is a key on the margin of each map defining "corn" as grain, T. Landwehr declared that when he certified his crops, he relied exclusively on an aerial photo and that any key was added by the FSA after his certification.  (*Id.* ¶ 7.)

Even if the photographs contained a key, it remains unclear whether T. Landwehr and Marthaler's interpretation of certifying BMR corn as grain was improper, considering a dispute over BMR's suitability to be harvested as silage or grain.  Specifically, the

parties dispute whether BMR is adapted for silage use only.[16]  There is no official

guidance on seeds adapted for silage use only.[17]  According to Plaintiffs' expert, Steve

Plehn ("Plehn"), while BMR can technically be harvested as grain, it makes little sense to

do so.  He testified that BMR costs more than grain corn because of its digestibility,

however it produces less silage and less grain overall.  (Plehn Dep. at 118.)  Plehn also

stated that BMR is more susceptible to drought than grain corn, and that it has financial

limitations which make it inappropriate for the sole use of grain production.  (*Id.* at 119.)

Defendants' expert, Jennifer Miller ("Miller") disagrees with Plehn's assessment

that BMR is poorly suited for use in grain production.  (Miller Report at 4.)  She stated

that "the corn kernel produced by BMR is indistinguishable to that of a conventional

hybrid," and that when BMR hybrids are harvested as grain in Central Minnesota, its

yields are "very similar to and occasionally better than conventional corn hybrids."  (*Id.*

at 4.)

It is clear that there is a dispute within the field as to whether BMR can, or should

be harvested as grain.  Nonetheless, the record reflects that Defendants sought guidance

from their insurance agents over whether BMR could be insured as grain corn, and they

were told that it was allowed.  (*See, e.g.*, Doc. No. 97 ¶¶ 5-8, Exs. A-D.)  Therefore, it is

---

[16]    Corn that is adapted for silage use only cannot be insured as grain.  (Policy ¶ 5(b)(2)(ii).)

[17]    The record reflects that authorized private insurance companies instructed agents that only seeds with tags that say "silage-specific" must be insured as silage, and that BMR does not have such a tag.  (*See* Doc. No. 110 (Bentfield Decl.") ¶¶ 7-10.)  The record also reflects that at least one seed company promotes BMR as silage-specific. (Kraemer Decl. ¶10, Ex. C.)

plausible that Defendants reasonably interpreted that they could certify BMR as grain with the FSA and, therefore, did not *knowingly* submit a false claim.  *Donegan*, 833 F.3d at 878-79.  The Court finds that it is within the province of a jury to determine whether Defendants' interpretation was objectively reasonable.

In short, the Court simply cannot conclude as a matter of law whether or not Defendants knowingly made a false claim on their Form 578s.  In addition to questions with respect to custom and practice, there are disputes over key issues of material fact that preclude the Court from making such a determination.  Similarly, the Court cannot conclude as a matter of law that Defendants knowingly violated the FCA when they insured corn as grain that they intended to harvest as silage.

T. Landwehr and Marthaler testified that they relied heavily on their authorized private insurance agents to complete their insurance policies and adjust any claim.[18] (*See, e.g.*, T. Landwehr Dep. at 19-23, 75-77; Marthaler Dep. at 127-128, 139.) T. Landwehr testified that he provided his agent with "the crop and the acres" that he planted, but did not know to report the intended use of the crop.  (T. Landwehr Dep at 64.)  He also stated that no insurance agent or company ever asked him how he intended to harvest the crop until 2017.  (*Id.* at 72; T. Landwehr Decl. ¶ 8.)

Marthaler testified that "[y]ou've got to bring your documentation in to your crop insurance guy and then he sends it off or whatever."  (Marthaler Dep at 132.)  Marthaler's

---

[18]    T. Landwehr's insurance agent's testimony corroborates that an adjuster would notice a silage-only type of corn not revealed on the acreage report and that the consequence would be removal of those acres from the policy.  (Leistico Decl. ¶ 18, Ex. 14 ("Triplett Dep.") at 35.)

insurance agent, who also sells him a portion of the corn seed that he plants each year, averred that he was aware that Marthaler and Marthaler Farms planted BMR with an intent to harvest it as silage, but understood that it could be insured as grain.  (Bentfield Decl. ¶¶ 4, 6-10.)

Both T. Landwehr and Marthaler also testified that they never personally read any reference material regarding crop insurance regulations or polices.  (T. Landwehr Dep. at 85; Marthaler Dep. at 65.)   They argue that they did not know they were supposed to report intended use, that they were forthcoming with their insurance agents, and that they relied on their insurance agents to ensure that they had the appropriate coverage.

Plaintiffs contend that even if Defendants relied exclusively on their insurance agents, they still acted in reckless disregard by failing to be aware of crop insurance rules and policy provisions and are therefore liable for knowingly violating the FCA.  They also contend that Defendants had actual knowledge that their statements were false because Kraemer told them they were reporting inaccurately.  The Policy does include one statement clearly indicating that insurance is tied to intended use.  Nonetheless, the Court cannot conclude as a matter of law whether Defendants' reliance on their insurance agents to apprise them of the provision satisfies the FCA's knowledge requirement through reckless disregard.  Further, the Court does not speculate on whether Defendants should have relied on Kraemer's advise in lieu of following the direction of their authorized private insurance agents with respect to insuring their corn and submitting claims.

Again, the record is entirely devoid of the custom and practice of obtaining crop insurance.[19]  T. Landwehr's insurance agent testified, "I would like to say that it's not unheard of that a farmer plants grain corn and insures it for grain corn.  And because he's got a certain acreage near his farm buildings as silage, that it's still insured as grain corn, even though he intended it for silage.  It's not uncommon."  (Triplett Dep. at 26.)  He testified further that "[m]ost growers that I interact with that grow corn silage usually grow grain corn that they end up taking for silage."  (*Id.* at 28.)  Marthaler's insurance agent averred that he *knew* Marthaler intended to harvest BMR as silage but believed that it could be insured as grain.  (Bentfield Decl. ¶¶ 4, 6-10.)  If the custom and practice is to insure corn as grain, pay the premiums for grain, and take it for silage, the Court cannot as a matter of law conclude that Defendants knowingly violated the FCA.  It is within the province of the jury to determine to what extent it was appropriate for Defendants to rely on their insurance agents to assign coverage and premiums, particularly when the record reflects that the insurance agents were aware that insureds were insuring corn as grain that they ended up taking for silage.

In summary, the Court finds sufficient authority in the record to link corn insurance coverage to a grower's intended method of harvest.  Therefore, each time that Defendants insured all of their corn as grain when they intended to harvest at least some of it for silage, they submitted a false claim.  Nonetheless, the Court cannot conclude as a

---

[19]    Conspicuous by its absence is that neither Plaintiffs nor Defendants even mention the custom and practice.  The Court does not speculate as to why, but it cannot ignore the omission.

matter of law that Defendants submitted any false claim knowingly; therefore, Plaintiffs' motion for summary judgment is denied.

## IV.   Defendants' Motion

Defendants move for summary judgment on all counts for a variety of reasons. Defendants also seek an award for attorney fees and expenses because they allege that Plaintiffs' claims are vexatious and brought primarily for purposes of harassment.

### A.   Liability Under FCA

Defendants argue that Plaintiffs' first and second causes of action on behalf of the Government should be dismissed against specific Defendants for different reasons.  The Court addresses each argument in turn.

Defendants argue that Westland, Union, Alpha, Dairyridge, Marthaler Farms, Marthaler, and T. Landwehr should be dismissed because any claim they made was not false, and, in the alternative, no false claim was made knowingly, and none was submitted as a claim for payment to the government.  As set forth above, the Court cannot conclude as a matter of law whether or not Defendants knowingly violated the FCA when they submitted false claims.  Although Plaintiffs moved for summary judgment only against Defendants United, Union, Westland, T. Landwehr, Marthaler, and Marthaler Farms, the same reasoning applies to all Defendants.  Accordingly,

Defendants' motion with respect to Westland, Union, Alpha, Dairyridge, Marthaler Farms, Marthaler, and T. Landwehr is denied.[20]

Defendants argue that United should be dismissed because it is a management entity that does not own crops or crop insurance.  Similarly, Defendants contend that United Partners Ridgeway, Achen, Hennen, S. Landwehr, and M. Landwehr should be dismissed because they were not personally involved with certifications or procurement of crop insurance.  Nonetheless, United is a partnership with interests in the entities that allegedly violated the FCA.  United and its partners are still liable under the FCA if they knowingly conspired to present, or cause to be presented, a false or fraudulent claim for payment to the Government.  31 U.S.C § 3729(a)(1)(c); *see also Henry v. U.S.*, 424 F.2d 677, 678-79 (5th Cir. 1970).  Based on the record, the Court cannot conclude as a matter of law whether or not these defendants are liable under the FCA.  Therefore, Defendants' motion with respect to United, Ridgeway, Achen, Hennen, S. Landwehr, and M. Landwehr is also denied.

Defendants argue that Dairyridge should be dismissed because Plaintiffs failed to plead fraud with particularity as required by Fed. R. Civ. P. 9(b).  "To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and

---

[20]     Because the Court cannot conclude whether Defendants knowingly made false claims, it does not address Defendants' third argument that no claim was submitted for payment to the government.

what was obtained as a result." *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552,

556 (8th Cir. 2006.)  Defendants point to a single paragraph in Plaintiffs' Complaint and

contend that it provides no information about what Dairyridge allegedly did wrong.[21]

Taken in isolation, the paragraph provides insufficient information on Dairyridge's

alleged wrongdoing.  Nonetheless, Plaintiffs' Complaint as a whole clearly details

precisely what Dairyridge is accused of—namely, falsely certifying BMR corn as grain

when it was harvested as silage.  (*See* Compl. ¶¶ 72- 81.)  Rule 9 "is intended to enable

the defendant to respond specifically and quickly to the potentially damaging

allegations." *U.S. ex. Rel. Joshi*, 441 F.3d at 556.  The Court finds that Plaintiffs have

plead with sufficient particularity to allow Dairyridge to respond specifically to what it is

accused of.  Therefore, the Court declines to dismiss Dairyridge for insufficient pleading.

Finally, Defendants argue that Silverstreak should be dismissed because it did not

certify BMR or any similar nonconventional varieties as grain corn during the relevant

years.[22]  Silverstreak moved for summary judgment in 2017 for similar reasons.  (*See*

Doc. Nos. 34, 36.)  At that time, the Court found that Silverstreak's motion was

premature and denied it without prejudice.  (Order at 20.)  The Court observed,

---

[21]    The allegation Defendants cite states "Marthaler is growing BMR corn.
Photographs recently taken of the corn growing on the land owned by Dairyridge, the
entity in which Marthaler has an ownership interest, showing BMR corn (with the
exception of the final paragraph which shows conventional corn for comparison
purposes) are attached hereto as Exhibit 24."  (Compl. ¶ 67.)

[22]    Defendants make the same argument with respect to Hennen.  As discussed *supra*,
Hennen is a partner in United; therefore, the Court declines to dismiss him from this
action.

12

"additional discovery [could] reveal that Silverstreak is plainly entitled to summary judgment in its favor." (*Id.*)

The record now reflects that Silverstreak did not certify BMR or any similar nonconventional varieties as grain corn during the relevant years.[23] (*See* Doc. No. 96 ("Hayes Decl.") ¶¶ 12-22, Exs. A-F.)  Further, Plaintiffs did not respond to Defendants' argument with respect to Silverstreak.  During his deposition, Kraemer testified that "it appears through looking at Silverstreak that they, in fact, did certify most of their crops correctly."  (Leistico Decl. ¶7, Ex. 3 at 261.)

Even viewing the evidence and all reasonable inferences in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have failed to demonstrate existence of specific facts in the record that create a genuine issue for trial that Silverstreak is liable under the FCA.  *Krenlik*, 47 F.3d at 957.  Therefore, the Court grants Defendants' motion for summary judgment insofar as dismissing all causes of action against Silverstreak.

### B.  Unjust Enrichment

All Defendants seek dismissal of the claim for unjust enrichment because they argue that there is no evidence of wrongdoing and they were entitled to the money received for crop insurance payments.

---

[23]    In Silverstreak's previous motion for summary judgment, the Court identified 18 acres of corn certified as grain on Silverstreak's 2015 Form 578 for Benton County that Silverstreak failed to explain.  (Order at 19.)  The record now clarifies the discrepancy; however, it does not suggest false certification.  (Hayes Decl. ¶ 19-22, Exs. E-F.)

To prevail on a claim of unjust enrichment under Minnesota law, "the claimant must show that the defendant has knowingly received or obtained something of value for which the defendant in equity and good conscience should pay. [U]njust enrichment claims do not lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully." *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.3d 826, 838 (Minn. 2012) (citing *ServiceMaster of St. Cloud v. GAB Business Services, Inc.*, 544 N.W.2d 302, 306 (Minn. 1996)).

As discussed above, the Court cannot conclude as a matter of law whether or not Defendants are liable under the FCA and therefore cannot conclude whether or not Defendants are entitled to the benefits they received from their crop insurance companies. Therefore, the Court denies Defendants' motion for summary judgment with respect to unjust enrichment.

### C.      Retaliation

Defendants United, Union, Ridgeway, Achen, S. Landwehr, T. Landwehr, M. Landwehr, and Hennen, also seek dismissal of Kraemer Count I, retaliation damages under the FCA, because it was already litigated and disposed of in arbitration and, in the alternative, because FCA retaliation damages are only available in an employment-type relationship. (*Id.* at 48-49.)

The Court declines to dismiss Kraemer Count I. While it is true that Plaintiffs' breach of contract claims were disposed of in arbitration, retaliation under the FCA is a separate cause of action. While there may be overlapping evidence, each cause of action

26

requires resolution of different factual inquiries; therefore, the Arbitrator's resolution of

Plaintiffs' breach of contract claims do not bar Plaintiffs from seeking judgment on their

retaliation claim under the FCA.

Further, the Court is not persuaded by Defendants' argument that the retaliation

claim should be dismissed because Kraemer is not an employee.  The FCA's relief from

retaliatory actions is not limited to employees:

> Any employee, contractor, or agent shall be entitled to all relief necessary
> to make that employee, contractor, or agent whole, if that employee,
> contractor, or agent is discharged, demoted, suspended, threatened,
> harassed, or in any other manner discriminated against in the terms and
> conditions of employment because of lawful acts done by the employee,
> contractor, agent or associated others in furtherance of an action under this
> section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).  Kraemer was a partner in United; therefore, he may be entitled

to relief as an agent if Defendants are liable under the FCA.  In short, the Court finds that

Kraemer Count I survives.

### D.    Attorney Fees

Finally, Defendants seek an award for attorney fees and expenses because they

allege that Plaintiffs' claims are vexatious and brought primarily for purposes of

harassment.  (Doc. No. 23 at 19 ¶¶ 1-5.)  The argument is premature.  The FCA provides:

> If the Government does not proceed with the action and the person bringing
> the action conducts the action, the court may award to the defendant its
> reasonable attorneys' fees and expenses if the defendant prevails in the
> action and the court finds that the claim of the person bringing the action
> was clearly frivolous, clearly vexatious, or brought primarily for purposes
> of harassment.

31 U.S.C. § 3730(d)(4).  Therefore, Defendants may be entitled to attorney fees if:

(1)  they prevail in the action; and (2) the court finds that Plaintiffs' claims were

frivolous, vexatious, or brought primarily for purposes of harassment.

The Court cannot conclude as a matter of law whether or not Defendants are liable

under the FCA; therefore, they have not prevailed in this matter and an award of attorney

fees is premature.

## CONCLUSION

For the reasons set forth above, the Court denies Plaintiffs' motion for partial

summary judgment.  It grants Defendants' motion for summary judgment to the extent

that all causes of action against Silverstreak are dismissed, but denies Defendants' motion

in all other respects.

## ORDER

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED**

that:

1.    Plaintiffs' Motion for Partial Summary Judgment (Doc. No. [86]) is

**DENIED.**

2.    Defendants' Motion for Summary Judgment (Doc. No.[92]) is **GRANTED**

to the extent that all causes of action against Defendant Silverstreak Dairies, LLC, a

Minnesota limited liability company, are **DISMISSED WITH PREJUDICE**.

Defendants' motion is **DENIED** in all other respects.

**LET JUDGMENT BE ENTERED ACCORDINGLY AS TO DEFENDANT**

**SILVERSTREAK DAIRIES, LLC.**

Dated:  June 19, 2019                 s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge