## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, ex rel. Kenneth Kraemer, and Kenneth Kraemer and Kraemer Farms, LLC, a Minnesota limited liability company, | Civil No. 16-3092 (DWF/LIB) |
| Plaintiffs, | |
| v. | |
| United Dairies, L.L.P., a Minnesota limited liability partnership; Union Dairy, L.L.P., a Minnesota limited liability partnership; Westland Dairy, LLP, a Minnesota limited liability partnership; Alpha Foods, L.L.P., a Minnesota limited liability partnership; Nicholas Ridgeway; Craig Achen; Steven Landwehr; Thomas Landwehr; Matthew Landwehr; Robert Hennen; Silverstreak Dairies, LLC, a Minnesota limited liability company, Greg Marthaler, Marthaler Properties Family LLLP, a Minnesota limited liability limited partnership, d/b/a Marthaler Farms, and Dairyridge, Inc., a South Dakota corporation, | **FINDINGS OF FACT CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT** |
| Defendants. | |

The above-entitled matter came before the Court on a nine-day bench trial commencing on August 9, 2021 through August 18, 2021 and concluding on August 31, 2021. Patrick B. Steinhoff, Esq., Thomas F. DeVincke, Esq., and Matthew A. Anderson, Esq., appeared for Plaintiffs and Relators Kenneth Kraemer and Kraemer Farms, LLC.

Gary L. Lestico, Esq., and Alex T. Mastellar, Esq., appeared for Defendants.  Chad Blumenfeld, Esq., appeared on behalf of the United States.

## INTRODUCTION

Plaintiff-relators Kenneth Kraemer ("Kraemer") and Kraemer Farms, LLC (collectively, "Plaintiffs") initiated this *qui tam* action on behalf of the United States of America (the "Government"), against Defendants United Dairies L.L.P. ("United"), a Minnesota limited Liability partnership; Union Dairy, L.L.P. ("Union"), a Minnesota limited liability partnership; Westland Dairy, LLP ("Westland"), a Minnesota limited liability partnership; Alpha Foods, L.L.P. ("Alpha"), a Minnesota limited liability partnership; Nicholas Ridgeway ("Ridgeway"); Craig Achen ("Achen"); Steven Landwehr ("S. Landwehr"); Thomas Landwehr ("T. Landwehr"); Mathew Landwehr ("M. Landwehr");[1] Robert Hennen ("Hennen"); Silverstreak Dairies, LLC ("Silverstreak"), a Minnesota limited liability company; Greg Marthaler ("Marthaler"); Marthaler Properties Family LLLP ("Marthaler Farms"), a Minnesota limited liability limited partnership, d/b/a Marthaler Farms; and Dairyridge, Inc.("Dairyridge"), a South Dakota corporation (collectively "Defendants").  (Compl.)

Plaintiffs' *qui tam* Complaint was filed under seal on September 15, 2016.  (*Id.*) Pursuant to 31 U.S.C. § 3730(b)(4)(B), the United States on August 3, 2017 declined to

---

[1]     Plaintiffs' Complaint refers to this Defendant as "Matthew Landwehr." (Doc. No. 1 ("Compl.") ¶ 6.)  According to Defendants, the proper spelling of this Defendant's name is "Mathew Landwehr."  (Doc. No. 23 ("Answer") ¶ 6.)  The Court will use Defendants' spelling.

intervene in this action.  The United States also acknowledged at that time that pursuant to 31 U.S.C. § 3730(b)(1), the Relators could proceed with the action in the name of the United States.  The Complaint was unsealed on August 4, 2017 and served on Defendants between August 24 and September 5, 2017.  (*See* Doc. Nos. 18, 25, and 26.)

Kraemer asserts two causes of action under the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1), and a third cause of action for Unjust Enrichment, on behalf of the Government.[2]  (Compl. ¶¶ 72-81.)  Kraemer and Kraemer Farms, L.L.C. initially alleged four additional causes of action (the "Kraemer Counts"):  (1) retaliation under the FCA, 31 U.S.C. § 3730(h) against Defendants United, Union, Ridgeway, Achen, S. Landwehr, T. Landwehr, M. Landwehr, and Hennen (*id*. ¶¶ 82-87); (2) breach of contract against United, and the same individuals listed in Kraemer Count One (*id.* ¶¶ 88-96); (3) declaratory judgment against the same defendants for the breach of contract alleged in Kraemer Count Two (*id.* ¶¶ 97-103); and (4) breach of contract against Union (*id.* ¶¶ 104-08).

The Court dismissed Count IV with prejudice on March 26, 2018.  (Doc. No. 66.) The Court found Counts II and III subject to mandatory arbitration and dismissed them without prejudice on July 6, 2018.  (Doc. No. 69 ("Order").)  Counts II and III were

---

[2]      The first and second causes of action are alleged against Defendants United, Union, Westland, Alpha, Hennen, Silverstreak, Marthaler, Marthaler Farms, and Dairyridge for "[s]ubmission, or [c]ausing the [s]ubmission, of False Claims" (Compl. ¶¶ 72-75); and "[u]sing a [f]alse [r]ecord or [s]tatement to [o]btain [p]ayment of a False Claim" (Compl. ¶¶ 76-79 ), respectively. The third cause of action is alleged against all Defendants.  (Compl. ¶¶ 80-81.)

subsequently resolved through arbitration on August 30, 2018.  (Doc. No. 95 ("Leistico Decl.") ¶ 5, Ex. 1.)

The Court dismissed Defendant Silverstreak as a party in 2019 (Doc. No. 126), but concluded that a genuine dispute of material fact continued to exist as to whether the remaining Defendants knowingly presented false claims.  That issue is now before the Court.  Before the Court in the Court trial noted above, were Plaintiffs' False Claims Act pursuant to 31 U.S.C. § 3729(a)(1), Plaintiffs' allegations of Unjust Enrichment Claims against said Defendants, and Plaintiffs' False Claim Act pursuant to 31 U.S.C. § 3730(h)(1) alleging retaliation by the Defendants against Plaintiff Ken Kraemer. Plaintiffs are also requesting reasonable costs and attorneys' fees.  Defendants move the Court pursuant to their counterlcaims for attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d)(4).

Based upon the presentation of the parties, including the extensive testimony of the witnesses and the voluminous exhibits produced at trial, as well as counsel's arguments and post-trial submissions, the entire record before the Court, and the Court being otherwise duly advised in the premises, the Court hereby issues its Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## SUMMARY OF DECISION

The Court finds that Plaintiffs-Relator Kenneth Kraemer and Kraemer Farms, LLC have failed to meet their burden to prove at trial that any Defendant knowingly made any false claims.  Knowingly, as the Court indicated prior to trial, was the crucial issue for the Court.  This finding and conclusion of the Court results in a dismissal by the

Court of the false claims before the Court.  Consequently, the Court declines to treble the damages or impose civil penalties pursuant to 31 U.S.C. § 3729.  However, as the Findings and Conclusions indicate, the Court has concluded that the Defendants were unjustly enriched and as a result the United States incurred damages of $1,007,191.30, 30% of which the Court has awarded to the Plaintiffs pursuant to 31 U.S.C. § 3730 (d)(2). However, for the reasons stated, the Court has declined to award attorneys' fees and costs to either party, and each side will be responsible for their own attorneys' fees and costs.

The Court is fully aware that apart from each party's objections with respect to the Court's findings and decision on liability based upon the record before the Court, both parties for entirely different reasons will take serious issue with the appropriate measure of damages.  For that reason alone, the Court is hopeful that given the difficult crossroads the parties are at in the context of the Court's decision, and with or without the help of the Court, that the parties will try to sit down and resolve this case before filing additional motions before this Court and an appeal.

### FINDINGS OF FACT

1.    Defendant United Dairies, L.L.P. ("United Dairies" or "Partnership"), is a Minnesota limited liability partnership.  Union Dairy, L.L.P. ("Union Dairy"), Westland Dairy, LLP ("Westland Dairy"), and Alpha Foods, L.L.P. ("Alpha Foods") are subsidiaries of United Dairies.  Union Dairy and Westland Dairy are both dairies that keep and maintain dairy herds for the production of milk.

2.    Defendants Nicholas Ridgeway, Craig Achen, Steven Landwehr, Thomas Landwehr, Mathew Landwehr, and Robert Hennen are all partners in United Dairies.

The Defendants associated with United Dairies are referred to collectively herein as the "Partnership Defendants."

3.      Plaintiff and Relator Kraemer Farms, LLC ("Kraemer Farms") is a Minnesota limited liability partnership.

4.      Plaintiff and Relator Kenneth Kraemer was formerly a general partner in United Dairies until his disassociation from United Dairies effective December 31, 2018. Kraemer also owned a 2% interest, individually, in Union Dairy separate from his ownership interest through United Dairies until his disassociation effective December 31, 2018.

5.      Marthaler Properties Family LLLP, is a Minnesota limited liability limited partnership, d/b/a Marthaler Farms ("Marthaler Farms").  Greg Marthaler ("Marthaler") is a partner of Marthaler Farms.

6.      Dairyridge, Inc. ("Dairyridge"), is a South Dakota corporation.

7.      This case relates to what has been described as a crop insurance program administered, overseen and funded by the United States Department of Agriculture ("USDA").  The USDA administers crop insurance policies through its Federal Crop Insurance Corporation ("FCIC") and its Risk Management Agency ("RMA").  The RMA serves as a reinsurer to private insurance companies.  The RMA has a contract with the private insurance companies that sell and administer its policies.  The private insurance companies in turn have a contract with the growers who purchase the insurance policies.

8.      The RMA instructs growers to direct any questions they have about the insurance policies to agents who work for the private insurance companies.

9.      The RMA enters into the Standard Reinsurance Agreements with approximately 16 private insurance companies (also known as Approved Insurance Providers or AIPs) that in turn have their own private agents who, as noted above have contact with producers.

10.      The policy that the AIPs use is in the Code of Federal Regulations, which is the contract between the company, who is approved to act on RMA's behalf and then sell it to the producer-farmer.  The RMA's contract, the Standard Reinsurance Agreement, is with the private insurance company.

11.      Duane Voy ("Voy"), the former regional director of the Risk Management Agency at the St. Paul regional office from 2012 until his retirement in February 2021, credibly testified that a farmer never talks to the government about the insurance contract. Rather, the farmers go to their insurance agent, who sells and services the insurance policies.  Importantly, Voy credibly testified that the farmers rely on their agents regarding the specifics of the policies and if an agent does not have an answer or has a question, they then generally go to their company, namely, their AIP.  Then, if the AIP cannot answer a question, Voy credibly testified that the farmers go to the RMA office where Voy used to work in St. Paul, Minnesota.

12.      With respect to Voy's testimony which is a key issue for this Court, the Court finds he credibly testified that the farmers did rely on their insurance agents and that, based upon his experience, it is reasonable for farmers to ask insureds to do so knowing that the insurance agents rely on their AIPs.

13.     Crops may be insured with either a revenue protection ("RP") or yield protection ("YP") plan.

14.     RP is "a plan of insurance that provides protection against loss of revenue due to a production loss, price decline or increase, or a combination of both." 7 CFR § 457.8.  RP guaranteed per acre is "determined by multiplying the production guarantee (per acre) by the greater of your projected price or your harvest price."

15.     YP is a plan of insurance that only provides protection against a production loss and is available only for crops for which revenue protection is available.  YP guaranteed per acre is determined by multiplying the production guarantee by the projected price.  The coarse grains crop insurance provisions state that the "production guarantee (per acre)" is "the number of bushels (tons for corn insured as silage) determined by multiplying the approved yield per acre by the coverage level percentage the grower elects."  7 CFR § 457.113 ¶ 1.

16.     Grain corn is measured and sold by the bushel.  There are commodity market price indices for grain corn.

17.     Silage is measured and sold by the ton.  There is not a commodity market price index for silage.

18.     The type of insurance coverage available for corn under the coarse grains crop insurance provisions depends on the county where the crop is grown.  The Policy designates counties as grain only, silage only, or both grain and silage.

19.     Silage is defined as "a product that results from severing the plant from the land and chopping it for the purpose of livestock feed."  7 CFR § 457.113 ¶ 1.  The

Policy specifies that coverage is not available for "a variety of corn adapted for silage use

only when reported for insurance as grain."  7 CFR § 457.113 ¶ 5(b)(2)(ii).

20.     As the Court has noted to the parties on more than one occasion, it is truly

surprising to this Court and in many ways, is one of the reasons why the parties are

before the Court, that no statute, regulation, or crop insurance handbook defines which

varieties of corn are adapted for silage use only that cannot be reported for insurance as

grain.  There is no federal statute, regulation or formal agency guidance that specifies

which corn varieties are "silage use only."  In fact, Voy testified that RMA does not

publish any list varieties of corn adapted for silage use only, and that insureds seek the

advice of and rely on their insurance agents and seed dealers for guidance.

21.     Since at least 2011, the price drop component of RP coverage has only been

available for corn reported as grain.

22.     Since 2011, the price drop component of RP coverage has not been

available for corn reported as silage.

23.     The RMA publishes a resource entitled Crop Insurance Handbook, which is

incorporated by reference into the federal regulations relating to the USDA's crop

insurance program.  The Crop Insurance Handbook provides instruction on when growers

are required to report corn crops as grain and when growers are required to report corn

crops as silage.  On this topic, the Crop Insurance Handbook in effect for all crop years

relevant to this action stated in relevant part as follows:

> For corn, grain and silage counties are counties for which the
> actuarial documents provide both grain and silage types.  Both types
> are insurable. Insureds must report insurable acreage by unit and by

type (grain or silage) according to the intended method of harvest; however, a variety of corn adapted for use as silage only is not insurable as grain and must be insured as silage.

24.     Importantly, the Handbook is not directed to the insureds.  The Handbook specifically states that it is to provide underwriting standards to approved insurance providers.  The Handbook also provides that any questions regarding the procedures in the Handbook are to be directed to the AIP.  The Court would also note that Voy testified that they do not expect insureds to see, know, read or otherwise be aware of the provisions of the Handbook.

25.     Each year, the FSA collects information for certain farm programs on a form called an FSA Form 578.  The information reported on Form 578 is used in the implementation of the USDA's crop insurance program.  In particular, the RMA uses the information reported on FSA Form 578 to cross-check and verify the information provided by growers to the private insurance companies.  Also, growers and crop insurance agents use the completed Form 578 as the basis for the crop information reported to the private insurance companies.  Growers report the crops planted each year to the FSA on Form 578.  This is done early in the growing season shortly after the crops are planted prior to the July 15th deadline.  Moreover, on FSA Form 578, growers report the "type" of crop planted in each field along with the "intended use" of that crop. However, while Form 578 includes a column labeled "Intent Use," the testimony by a number of the Defendants including T. Landwehr and Marthaler credibly stated that they relied on FSA agents to help complete Form 578.

10

26.     The crop insurance agent uses the information reported on FSA Form 578 to complete what is called, the Acreage Reporting Form.  The Acreage Reporting Form was developed by the USDA but is customized by private crop insurance companies.

27.     An Acreage Reporting Form is countersigned by both the grower and the grower's insurance agent.  And, notably, as on the FSA Form 578, the signature blocks on Acreage Reporting Form include certification language by which the grower attests that the information reported on the form is accurate.  Voy credibly testified that the Acreage Reporting Form is filled out by the agent and grower in July of each year.

28.     The private crop insurers insure crops based on the information provided to it by the grower in the Acreage Reporting Form.  If a corn crop is reported as "grain" on the Acreage Reporting Form, the insurer will insure it as grain corn.  If a corn crop is reported as "silage" on an Acreage Reporting Form, the insurer will insure it as silage.

29.     The insurance as grain corn or silage attaches at the time of planting and remains as reported by the grower on the Acreage Reporting Form.  This remains the case even if the grower harvests the crop differently than the method indicated on the Acreage Reporting Form.

30.     The policy for coarse grains requires a grower to notify its insurer if the grower harvests a corn crop differently than it reports on its Acreage Reporting Form. This provision provides flexibility for situations in which there are changes in circumstances between the submission of the Acreage Reporting Form and the time of harvest.  (*See* Coarse Grains Policy, ¶ 10(c), Plf. Ex. 3.)  Voy gave "drought" as an

11

example of a change in circumstance that would justify a grower to deviate from the intended method of harvest stated on the Acreage Reporting Form.

31.     Voy also testified that the Acreage Reporting Form is generally prefilled out by the agents as to the type and practice and then the farmer adds how many acres and the date they planted.  Wayne Triplett ("Triplett"), who had been a crop agent since 1995 and had been providing crop insurance to the United entities and about 10 other dairy farms, credibly testified that it is important that the acreage map lines up with the FSA 578.  Voy also testified that RMA generally does not have access to FSA Form 578, but RMA sometimes requests it for a compliance review.

32.     If a grower notifies its insurer that it is changing its method of harvest reported on its Acreage Reporting Form, the insurer sends an adjustor to measure the growers' yield.  A grower's historical yield is captured in a record known as Annual Production Harvest or "APH."  The APH is calculated differently for grain corn and silage.

33.     In order to make a loss claim on a crop insurance policy, a grower must notify the grower's crop insurance agent.  The agent then submits the claim to the grower's crop insurer, which then issues a check to the grower.

34.     The evidence does establish that all Defendants before the Court planted corn with the intent of harvesting the corn as silage.

35.     However, the Court also finds that Triplett credibly testified that he always recommended they insure their corn as grain corn with an RP policy, even if they intended to chop it for silage.  Triplett acknowledged that a variety of corn adapted for

silage use only cannot be insured as grain.  Triplett went on to credibly state that he was fully aware that the United entities and in fact, "most dairies plant corn for grain and they take silage."  Triplett then said consistent with other testimony in the case that it was acceptable for farmers to insure corn as grain that is intended to be taken as silage with a revenue protection policy so long as the variety can be combined for grain.  He then stated that he is familiar with the BMR corn varieties and knows that it can be combined and therefore it can be insured as grain.  Importantly, Triplett credibly stated that "in the process of an appraisal, which has to be done for insuring corn as grain, but not generating a scale ticket, the adjuster would also notice if there was any discrepancy in the variety if it looked like it wasn't dual-purpose corn."

Defendants and their agents credibly testified, and the documents support the fact that the Defendants always notified their agents prior to chopping silage so that an adjuster could complete an appraisal on the fields to be chopped.  It is then the insurance adjuster's role to calculate actual production in grain yields.

36.     Triplett then credibly testified that growers that report corn for insurance as grain but harvest it as silage must notify him prior to harvest.  At that time, Triplett then provides notice to the insurance company and generates a document called "notice of loss" so that an adjuster can be sent to appraise the crop.  He also credibly testified that "it's standard procedure to put in a notice of loss to indicate they were going to cut silage" and send an adjuster to appraise the crop "because the corn is not going to be used for grain.

37.     Triplett also credibly testified and agreed that it is reasonable for farmers to understand that they did everything properly and are insuring correctly if they pass an audit, which each and every Defendant in this case did.  Moreover, Triplett said he was never informed by the AIP that Westland or Union Dairy was insuring incorrectly.  Triplett concluded his testimony by stating that the insurance carrier knew that Westland and Union were insuring corn for revenue protection and knew that they intended to harvest a large part of it for silage and never informed him that they were doing anything wrong or insuring incorrectly.  Triplett also confirmed that the AIPs instruct him to always offer grain insurance for corn as long as the producer is not growing a silage-only variety, and that most, if not all, of his clients and producers insure their corn as grain with a revenue protection policy.

38.     George Bentfield ("Bentfield") testified in the case as well.  He has been an insurance agent since 2008.  He acknowledged that you must designate silage or grain at acreage reporting time.  However, he also credibly stated that even if the intent is to harvest silage only, you can still properly and legally insure as grain.  And, he said as other testimony credibly established in the case that farmers rely on agents like him as to how to insure their crop.  Moreover, he further credibly testified consistent with other evidence in the case that even if a grower lists as silage and intended to use as silage, it is still proper to insure as grain unless it is a silage-variety only.

Significantly, Bentfield testified that "I have never insured a crop as silage-only" and he also credibly testified that he is instructed by the insurance company to offer grain insurance unless it is a silage-only variety.  He then said consistent with other evidence in

14

the case which the Court will address below, that he has never viewed BMR as a silage-only corn brand.  In his view, any advice he would give to grower-farmers was that the intent does not matter, it can all be insured as grain corn unless a specific variety of silage only is being used which he states he has never sold to anyone.  Bentfield, simply, but importantly stated, "I just do what the AIP tells me to do."

Numerous witnesses credibly testified, and the evidence establishes, that when an adjuster is sent out to examine a field, the adjuster will know if it is indeed a dual variety corn.  Consequently, the evidence established and confirmed that an adjuster would in fact notice a silage-only type of corn not revealed on an acreage report and the consequence would be removal of those acres from the policy.

39.     The credible testimony of almost every witness, and there was no testimony to the contrary, including Tom Landwehr and numerous other witnesses, established that no Defendant ever failed an audit and no one ever asked any of the Defendants to return any money that they have received during the years in question before this Court.

40.     As the Court has observed in prior orders, (Doc. No. 127, p. 21), there was no testimony from either Plaintiffs or Defendants and the record is entirely devoid of the custom and practice of obtaining crop insurance across the United States of America.

41.     Plaintiffs called as an expert witness Steve Plehn ("Plehn").  Plehn testified that BMR corn was adapted for silage only.  However, the evidence also established that the adjusters who are called in will know if it is a dual-purpose variety corn.  However, unlike Jennifer Miller ("Miller"), an agronomist, who the Court will address below, Plehn

did not have clients in Minnesota informing him to what extent, if any, they were using BMR varieties.

42.     Miller, who is an agronomist and farmer with 97 clients, credibly testified that BMR is a dual-purpose variety corn for both grain and silage, and that she has never worked with or recommended a corn variety that is silage only.

43.     David Tomsche ("Tomsche") credibly testified he was a 62 percent owner and President of Dairyridge, with his brother Dan and Greg Marthaler.  Consistent with other testimony in the case, he testified that no company or agency has ever asked for any crop insurance money to be paid back or suggested that Dairyridge is doing anything wrong.  In fact, Tomsche testified that he was told by the FSA to report all corn as grain and that he does buy BMR corn, which he considers a dual-purpose corn and not silage-specific.  Specifically, he credibly stated, "I will need X number of tons of silage once a year for my cows.  So we will harvest silage until we reach that number and make the rest (grain) corn.  It is reported as grain because when I am at the FSA office, I am told to report it as grain."

Tomsche went on to state, consistent with other credible testimony in the case, that their insurance agent is always notified when silage chopping will occur, and the agent then coordinates and arranges for an adjuster to come to the field to measure the corn left in the strips.  It is then obvious that the field was taken for silage.  The adjustment he stated is how the APH is determined.

44.     On the damage issue, Tomsche did state that to the extent that Kraemer is claiming Dairyridge was improperly paid (P. Ex. 123, check for $41,640), Tomsche

confirmed that the $41,640 in 2014 was all for prevent plant or yield loss and that none of it was for price drop or revenue protection.

45.     With respect to Kraemer's retaliation claim, there was credible testimony during the trial that there had been a breakdown in the relationship between Kraemer and the other partners for a number of years prior to Kraemer's discussion with Nick Ridgeway regarding crop insurance practices.  The testimony establishes that the partnership's decision to pay guaranteed partner payments for the partners was based upon those who had signed current, personal guarantees to address the additional risk being taken by those partners, which is the guarantee that Kraemer declined to sign because he felt it wasn't necessary and his prior signatures on guarantees were still in effect.  However, the decisions made by the partnerships were voted on at a meeting and approved consistent with the partnership agreement.  The evidence presented to the Court during the trial establishes, based upon the documents and testimony, that additional guarantees were indeed needed to be signed by each partner beyond the initial guarantees that Kraemer had signed and that Kraemer's refusal to sign those guarantees was contrary to the best interest of the partnership and his partners.

46.     The loss payments that Union Dairy received in 2013 and 2014 reduced by 30% to account for the division between corn as grain and corn as silage according to Plaintiffs' Ex. 4 (and summarized in Plaintiffs' Findings of Fact) is $452,813.90; total loss payments Westland Dairy received for 2013 and 2014 reduced by 30% is $326,814.60; total loss for Marthaler for 2013 reduced to 6.73% representing corn as grain is $22,256.24; total loss for Marthaler for 2014 reduced to 23.22% representing

corn as grain is $174,317.64; the loss payment for Dairyridge 2013 is $30,989; for a total of loss payments received by the Defendants of $1,007,191.30.

47.     Jeffrey Bazille ("Bazille"), who admittedly took an entirely different approach to evaluating the losses to the United States as a result of the Defendants' conduct, testified that the amount of loss to the United States is the amount of the net A&O payments plus the RMA share of the indemnity loss. Significantly, he did not include the premium subsidy or loss payments. Loss payments are what the Court utilized in Paragraph 46. In turn, Plaintiffs have asserted not only A&O payments, and the RMA share of the indemnity loss, but premium subsidies. Consequently, taking Mr. Bazille's approach, the total Government loss without a premium subsidy would be as follows: Union Dairy: A&O $13,550.00, RMA loss share $251,594.00 equals $265,144.00 reduced by 30% equals for 2013 and 2014, $185,600.80; Westland Dairy: A&O $20,120.00, RMA loss share $129,136.00 reduced by 30% equals $104,479.20; Marthaler A&O for 2013 $26,265.48 RMA loss share $27,940.00 equals $54,169.48 x 6.73% equals $3,645.60; representing corn as grain, 2014 A&O $32,466.85 RMA loss share $332,218.00 equals $364,684.95 x 23.22% of which equals $84,679.82 representing corn as grain; Dairyridge A&O $7,742.74.

Utilizing Bazille's approach with the Plaintiffs' analysis from Plaintiffs' Ex. 4, as summarized in Plaintiffs' Findings of Fact, the total loss to the United States is $386,148.16. The Court notes these findings without conceding the proper measure of damages which the Court has previously noted in Paragraph 46 as $1,007,191.30.

48.     The Court has also computed the alleged loss to the United States based upon the Plaintiffs' assertion that that loss should also include insurance premium subsidies, which the Court now will find and note in this paragraph.  Again, without conceding that Plaintiffs are correct in the measure of damages or the loss for the United States but based upon the same analysis as found in Plaintiffs' Ex. 4 (Plaintiffs' Findings of Fact), the premium subsidy loss is as follows:  Union Dairy:  $63,629.00 reduced by 30% equals $44,540.30; Westland Dairy:  $111,657.00 when reduced by 30% equals $78,159.90; Marthaler Dairy:  2013 – $165,749.00 multiplied by 6.73% equals $11,154.90; 2014 – $173,306.00 when multiplied by 23.22% equals $40,241.65; Dairyridge:  $36,356.00.  When the total of the premium subsidies of $210,452.75 is added to Bazille's analysis without those as noted in Paragraph 46, the total loss alleged by Plaintiff without the civil penalties or trebling the amount is $596,600.91.

49.     Any conclusion of law which may be deemed a finding of fact is incorporated herein as such.

Based upon the above Findings of Fact, the Court now makes the following:

## CONCLUSIONS OF LAW

1.     The Court concludes, consistent with prior rulings and the entire record before the Court, that each time the Defendants certified all of the crops as grain they made a false claim.  However, the Court further concludes that based upon all of the evidence before the Court, that while those claims were indeed material, that Plaintiffs have failed to prove that any claim was presented and submitted knowingly.  Given the Court's conclusion that the Plaintiffs have clearly failed to establish that the Defendants

19

knowingly submitted any false claim, the Court will dismiss the counts relating to a False Claim Act pursuant to 31 U.S.C. § 3729(b)(1)(2) and 31 U.S.C. § 3730.

2. The Court, however, concludes that because the Defendants made false claims, although not knowingly to the extent the Defendants received loss payments for corn they did not plant and harvest as grain, the Court finds and concludes the Defendants were unjustly enriched consistent with the damage findings set forth in the Court's Findings of Fact. Moreover, because the Court has dismissed the claims under the False Claims Act pursuant 31 U.S.C. § 3729 and § 3730, Plaintiffs are not entitled to attorneys' fees and expenses from the provisions of § 3729. Civil penalties and trebled damages are inapplicable since the judgment of the Court is for unjust enrichment and not in violation of the False Claims Act.

3. The loss payments the Defendants received must now "in equity and good conscious" be returned to the United States.

4. The Court concludes consistent with its Findings of Fact that the Plaintiff, Kenneth Kraemer, has failed to establish that the Defendants retaliated against him and therefore Plaintiff Kenneth Kraemer's claim of retaliation shall be dismissed by the Court.

5. Plaintiffs will be entitled to damages on their unjust enrichment claim in the amount of $1,007,191.30.

6. Relator Kenneth Kraemer is entitled to an award of 30% of the amount of the judgment against the Defendants.

7.      The Court concludes that the claims filed by the Plaintiff Kenneth Kraemer

pursuant to 31 U.S.C. § 3730(d)(4) were not clearly frivolous, clearly vexatious or

brought primarily for purpose of harassment and the Court will therefore be dismissing

Defendants' counterclaims against Mr. Kraemer for attorneys' fees and costs.

8.      Based upon the Court's evaluation of the evidence and consistent with the

Findings of Fact, and the Court's decision in this case as it relates to both parties, each

party shall be responsible for their own attorneys' fees and costs.

9.      Any finding of fact which may be deemed a conclusion of law is

incorporated herein as such.

Based upon the findings and conclusions of this Court, and the entire record of this

case, the Court enters the following:

## ORDER FOR JUDGMENT

1.      Relator Kenneth Kraemer's False Claims Act claim pursuant to 31 U.S.C.

§ 3730(h)(1) is hereby **DISMISSED WITH PREJUDICE**.

2.      Plaintiffs' False Claims Act claim pursuant to 31 U.S.C. § 3729(a)(1) is

hereby **DISMISSED WITH PREJUDICE**.

3.      Judgment shall be entered on Plaintiffs' unjust enrichment claim in favor of

Plaintiffs against the following Defendants, jointly and severely, as follows:

        a.      United Dairies, LLP and Union Dairy;

        b.      United Dairies and Westland Dairy;

        c.      Marthaler Farms and Dairyridge;

30% of the judgment is awarded to Relator Kenneth Kraemer and the remainder to the United States;

4.      Plaintiffs' request for reasonable costs and attorneys' fees is **DENIED WITH PREJUDICE**.  Each party shall be responsible for their own attorneys' fees and costs.

5.      Defendants' request for attorneys' fees and expenses are **DENIED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  March 30, 2022                    s/Donovan W. Frank
                                          DONOVAN W. FRANK
                                          United States District Judge